## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOAN MURRAY,<br><br>               *Plaintiff,*<br><br>    v.<br><br><br>PENNSYLVANIA MANUFACTURERS'<br>ASSOCIATION INSURANCE CO. *et al.,*<br><br>               *Defendants.* | CIVIL ACTION<br>No. 17-2282 |

**PAPPERT, J.**                                                            **March 27, 2018**
### MEMORANDUM

      Joan Murray sued her former employer, Pennsylvania Manufacturers'
Association Insurance Company, for violations of the Americans with Disabilities Act,
42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act, 43 Pa. Cons.
Stat. § 951 *et seq.* (2001). Murray also asserts a claim for aiding and abetting under the
PHRA against PMA employees Patricia Brookey and Kyleen Hastie. Defendants filed a
Motion for Summary Judgment (Mot., ECF No. 16) to which Murray responded (Pl's
Resp. in Opp., ECF No. 19).[1] PMA filed a Reply in support of its Motion. (Reply, ECF
No. 22.) The Court heard oral argument on March 15, 2018. (ECF No. 25.) After
considering the parties' positions and thoroughly reviewing the record, the Court
granted the Motion and entered judgment for the Defendants. (ECF No. 26.) This
Memorandum explains the Court's decision.

---

[1]      The Court's Policies and Procedures limit briefs, without leave of Court, to twenty-five pages
of double-spaced text. Murray filed a thirty-five page brief, most of it single spaced, without
permission to do so. A good deal of what Murray relies on is unhelpful to the Court because it is
either immaterial, goes beyond the record evidence or makes assertions that are contradicted by the
record, such as that it is "admitted" that the Defendants "fired [Murray] for being 'impaired' and for
being an alcoholic." (Pl's Resp. in Opp. at 24.)

# I

## A

Murray was hired as a cost containment specialist on February 27, 2006 by PMA, a property and casualty insurer that specializes in workers compensation coverage. (Pl's Resp. in Opp., Exs. 16–17 ("Murray Dep.") at 59:5-8; PMA Position Statement, Mot., Ex. A.) On that day, Murray signed a form acknowledging that she received PMA's employee handbook. (Mot., Ex. C.) The handbook includes several polices, including those governing substance abuse and workplace safety. (Mot., Ex. D.) The substance abuse policy provides, in relevant part, that "working under the influence of alcohol, illegal drugs, non-prescribed controlled substances, or any combination thereof, is prohibited." (*Id.*) Should an employee violate the policy, he or she could be subject to corrective action "up to and including termination of employment." (*Id.*) The workplace safety policy prohibits conduct such as making threatening remarks and similarly, should an employee violate the policy, he or she could be terminated. (*Id.*)

In her role as a cost containment specialist, Murray was responsible for reviewing medical bills and documentation from doctors and processing payments. She also reviewed petitions from physicians who were disputing the difference between how much they billed and how much they were paid. (Murray Dep. 60:21-61:13.) Murray was promoted to managed care product specialist in November 2012, a role that she remained in until her termination on December 14, 2015. (Termination Letter, Pl's Resp. in Opp., Ex. 8.)

As a result of several medical conditions, Murray requested—and was granted—six medical leaves of absence during her employment at PMA. She took medical leaves from October 25, 2007 to December 20, 2007 for shoulder surgery (Mot., Ex. H; Murray Dep. 72:1-18), from November 18, 2008 to January 4, 2009 for surgery related to an anal/vaginal fistula (Mot., Ex. I; Murray Dep. 77:1-78:23), and from June 16, 2009 to August 2, 2009 for abdominal surgery (Mot., Ex. J; Murray Dep. 83:2-21). Murray next took leave from August 2, 2011 to September 18, 2011 for hernia surgery (Mot., Ex. K; Murray Dep. 85:1-86:15) and from December 17, 2013 to January 20, 2014 for another fistula surgery (Mot., Ex. L; Murray Dep. 94:2-95:14). Murray took her sixth leave of absence from May 19, 2015 to June 3, 2015 for another shoulder surgery. (Mot., Ex. M; Murray Dep. 97:6-19.) Murray subsequently requested an accommodation to work from home until June 18, 2015 and PMA granted her request. (Murray Dep. 99:1-101:6.) For each leave of absence, Murray dealt with Senior Benefits Coordinator Regina Florian, who was responsible for employee requests for medical leave and workplace accommodations. (Murray Dep. 67:20-68:6; Pl's Resp. in Opp., Exs. 13-15 ("Carney Dep.") at 101:9-13.) Murray did not have any complaints about how PMA handled any of her requests for medical leave. (Murray Dep. 72:1-18; 78:16-21; 83:13-16; 86:13-15; 94:9-96:7; 101:12-17.) Murray did not receive any write-ups for violations of workplace policies throughout her almost ten-year career at PMA. (Carney Dep. 29:12-19.)

B

After returning from lunch on December 7, 2015, Murray stopped by the desk of her colleague, Anika Simmons, to speak to her about a form that Murray had left for her earlier in the day. Murray's interaction with Simmons brought to PMA's attention

the behavior for which Murray was ultimately fired. Specifically, it resulted in five separate PMA employees being asked to assess and interact with Murray and provide statements of their observations of Murray's conduct and demeanor. In addition to Simmons, those employees were registered nurse Jane Mueller, Senior Employee Relations Specialist Kyleen Hastie, Vice President of Managed Care Patricia Brookey and Nancy McGovern, another registered nurse. (Simmons Statement, Mot., Ex. O.) Simmons smelled alcohol on Murray's breath and observed that Murray "acted as if she was impaired" because her speech was slow, she was slurring her words, her eyes were low and disoriented, and she was repeating herself. Simmons also "smelled alcohol on [Murray's] breath." (*Id.*) Because this was not the first time Simmons "had an encounter with Joan and this type of behavior," she sent a text message to Mueller, another colleague in the managed care department, to share her concerns. (*Id.*) After reading the text, Mueller contacted Hastie to determine what steps Mueller should take. (Mueller Statement, Mot., Ex. P.) Hastie then sought guidance from Kevin Carney, PMA's Assistant Vice President of Human Resources, as well as Senior Vice President of Human Resources Andy McGill. (Pl's Resp. in Opp., Exs. 9-11 ("Hastie Dep.") at 57:8-14.) Hastie told Mueller to contact someone in management to confirm Simmons' suspicions and if that individual also believed that Murray was impaired, to contact Human Resources. (Mueller Statement.)

Mueller went to speak to Murray and observed that Murray appeared "disheveled [and] her speech was very slow and repetitive." (*Id.*) She learned that another PMA employee was concerned about Murray because she was seen walking with a "staggered gate." While talking to Murray, Mueller also "experienced a strong

smell of alcohol." She further noticed that Murray "was swaying and did not appear to comprehend" the conversation. All of this led Mueller to conclude, along with Dave Wallace—another PMA employee who had joined the conversation, that Murray was under the influence of alcohol. Mueller told her boss, Brookey, of Mueller's concerns. (*Id.*) Mueller also reported her observations to Hastie. Hastie and Carney then decided that Brookey and Hastie would meet together with Murray to assess her behavior. (Brookey Statement, Mot., Ex. Q; Hastie Dep. 57:15-18.)

During their meeting, which took place in Brookey's office, Brookey asked if there was any reason why Murray's colleagues would, based on their observations and smells, believe she was under the influence of alcohol. Murray explained that the smell of alcohol could be from mini-toothbrush refreshers or the fact that she smoked cigarettes. (Brookey Statement.) Murray claims that she told Brookey that she had "cotton mouth." (Murray Dep. 40:10-12.) Brookey observed that Murray "smelled of a distinct body odor of a rather musty nature" and was flushed, had a blank look at times, was slow to respond to questions and "rambling" in response to questions, changing the topic to non-related subjects. (Brookey Statement.) Brookey also stated that Murray's speech "was slower than normal and somewhat slurred." Based on all of these observations, Brookey concluded that Murray was impaired in her speech and manner of communication. (*Id.*) In her statement, Hastie also noted that Murray appeared "incoherent." She asked Murray if there was any reason why others would report that she smelled of alcohol. Murray provided several possibilities for the source of the odor, including her perfume, Listerine, "whispy" things (that "may have alcohol in them") for her teeth, that she hadn't showered that day or her dirty clothes. (Hastie Statement,

Mot., Ex. R.)  Murray also said that she takes medications but that she hadn't taken

any that day.  (Hastie Dep. 22:3-7; 36:3-5; 133:10-14; Hastie Statement; Pl's Resp. in

Opp., Ex. 12 ("Brookey Dep.") at 24:23-25.)  During this conversation, Hastie noticed

that Murray was struggling to form complete thoughts, her speech was slightly slurred

and she was speaking without any logical sequence.  (Hastie Statement; Hastie Dep.

59:21-25.)  After determining that Murray was impaired, Hastie left to speak with

Carney.  Concerned for Murray's safety, the pair made arrangements for a cab to take

her home.  (Hastie Dep. 22:12-19.)

While Hastie was with Carney, McGovern joined the meeting.  At this point,

Murray told Brookey that she had prescriptions for Xanax and Valium but had not

taken any that day.[2]  She added that the alcohol others smelled on her could be from

"some sort of mint" that she "sucks on…for her teeth."  (Brookey Dep. 24:23-25; Brookey

Statement.)  McGovern observed that "based on odor and verbal communication it

appeared [Murray] was impaired."  (McGovern Statement, Mot., Ex. S.)  McGovern

stated that Murray's speech was distorted, her words were "garbled" and she was

difficult to understand.  She also stated that Murray had never had "this level of

random thoughts and slurred level of speech" during conversations prior to that day.

(*Id.*)  Murray said that her difficulty speaking could be a result of "mouth refreshers

and medication use," though she did not cite any specific medications she thought could

be to blame, nor did she mention any conditions for which she could have taken

medications.  (*Id.*)  According to Hastie, Brookey and McGovern, Murray then pointed

her finger at Hastie and said words to the effect of "if anything happens with this, I will

---

[2]        In her deposition, Murray also testified that she did not take any Xanax, Percocet, or
Dilaudid that day.  (Murray Dep. 138:12-139:122.)

be after you." (Hastie Dep. 24:4-6; Hastie Statement; Brookey Dep. 25:9-11; Brookey Statement; McGovern Statement.) Murray denied making any such statement. (Murray Dep. 162:17-163:19.) The meeting concluded shortly thereafter and McGovern accompanied Murray to the bathroom. (Murray Dep. 131:11-15.) Brookey, Hastie and McGovern gathered Murray's purse and coat from her desk and led her out of the building to the cab which had been called to take Murray home. (Murray Dep. 131:16-24.)

C

Once Murray left, Hastie met with Carney and McGill. (Hastie Dep. 97:4-22.) Hastie described to McGill what she witnessed that day and McGill instructed Hastie to collect statements from the employees who had also observed Murray's behavior. (Hastie Dep. 99:3-15; 97:8-9.) McGill also told Hastie to suspend Murray while the company investigated the matter. Hastie collected the statements from Simmons, Mueller, McGovern and Brookey and gave them to McGill. Hastie also gave McGill her own statement. (Hastie Dep. 99:3-15; 97:8-9; Carney Dep. 77:3-78:6.) Two days later, Murray came back to the office. (Hastie Dep. 66:22-23.) She left after being unable to access her computer, after which Hastie called Murray and told her that she was not to come back to work until after the investigation was complete. (Hastie Dep. 67:6-12.)

After reviewing the statements, Carney recommended to McGill that he fire Murray. (Carney Dep. 12:8-10; 13:5-8.) McGill then made the decision to terminate Murray's employment for violating PMA's substance abuse and work place safety policies. (Hastie Dep. 21:12-17; Carney Dep. 73:9-12.) Murray was fired on December 14, 2015. (Termination Letter, Pl's Resp. in Opp., Ex. 8.)

II

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A mere scintilla of evidence in support of the nonmoving party will not suffice; there must be evidence by which a jury could reasonably find for the nonmoving party. *Id.* at 252. Summary judgment is appropriate where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

III

Murray first alleges that PMA discriminated against her because she had an actual or perceived disability. Just what she is purportedly disabled from, however, has evolved throughout the course of the litigation. In her Complaint, Murray alleges that she had "multiple serious medical conditions and disabilities," none of which were

identified in the pleading on account of "privacy concerns with medical diagnoses." (Compl. ¶ 24.)  At her deposition she testified that she suffers from ulcerative colitis, Crohn's disease, an anal and vaginal fistula and psoriasis.  (Murray Dep. 45:18-23.)  In her response to PMA's Motion, she is described as "severely disabled" and lists maladies, in addition to those she identified in her testimony, as uterine mesh, Enteritis, and hernia, "to name a few."  (Pl's Resp. in Opp. at 1, 9 ¶10.)  Murray's brief in response to PMA's Motion, however, focuses almost exclusively not on any of these alleged conditions, but instead on the argument that the Defendants discriminated against Murray because they perceived her to be an alcoholic.  (*Id.* 25-31.)

At oral argument on PMA's Motion, however, Murray's counsel returned to his client's other alleged non-alcohol related disabilities, though he narrowed the field significantly, stating that "her actual disability is that she has an anal/vaginal fistula that substantially inhibits her in the major life activity of excretion and hygiene."  (Hr'g Tr. 6:10-13.)  In fact, counsel explained that Murray's theory was actually even narrower than that, stating that she was discriminated against because of the effects of her medication for her underlying anal/vaginal fistula.  (Hr'g Tr. 32:1-4.)  Specifically, Murray takes Lomotil, a drug that slows bodily secretions, for her ulcerative colitis and anal/vaginal fistula.[3]  (Murray Dep. 35:14-20.)  Murray testified that she took Lomotil "at least three times a week" from 2008 until 2015 and the drug's only side effect was "cotton mouth."  (Murray Dep. 36:5-37:5; 35:16-24.)

---

[3]     Murray also testified that she uses alcohol wipes to relieve itching from her psoriasis. (Murray Dep. 32:9-17.)  The psoriasis, to the extent it would constitute a disability, is not the condition for which Murray is claiming to have been discriminated against.

The ADA makes it unlawful for an employer "to discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[4] To state a *prima facie* case of disability discrimination, the plaintiff must show that: "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) [s]he has suffered an otherwise adverse employment decisions as a result of discrimination." *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).

To prove the *prima facie* case, a plaintiff can rely on direct evidence or indirect evidence. "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of the fact *without inference or presumption.*" *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994) (emphasis in original); *see also Eastman v. Research Pharmaceuticals, Inc.*, No. 12-2170, 2013 WL 3949236, at *10 (E.D. Pa. Aug. 1, 2013) (Direct evidence is "overt or explicit" such that it "is so revealing of a discriminatory animus that no presumptions or inferences are needed.") Direct evidence requires "conduct or statements that demonstrate a discriminatory attitude." *Munoz v. Nutrisystem*, No. 13-4416, 2014 WL 3765498, at *4 n.5 (E.D. Pa. July 30, 2014) (citations omitted). If a plaintiff presents direct evidence of discrimination, the claim should be analyzed under a mixed-motive theory, meaning that a "plaintiff need only show that the unlawful motive was a 'substantial motivating factor' in the adverse

---

[4] PMA concedes that Murray is disabled within the meaning of the ADA and that she is qualified for the position. (Hr'g Tr. 5:12-14; 7:10-12.) The sole issue in the *prima facie* case for her "actual disability claim" is whether or not Murray was terminated because of that disability.

employment action." *Id.* (citing *Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 187 (3d Cir. 2003) (citation omitted)). If the plaintiff does so, the burden shifts to the employer to show that "it would have reached the same decision even if it had not considered the disability." *Id.*

Indirect evidence can also be used to prove the ultimate fact of discrimination, "but an inferential step by the factfinder is required to reach that fact." *Id.* (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 930 (3d Cir. 1997)). Disability discrimination claims based on indirect evidence are analyzed under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]." *McDonnell Douglas*, 411 U.S. at 802. If the defendant meets its "relatively light burden" of articulating a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to "show by a preponderance of the evidence that the employer's explanation is pretextual." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The plaintiff must either point to direct or circumstantial evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764. The plaintiff "must demonstrate such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.* at 765.

## B

### i

PMA argues that Murray failed to present any indirect evidence of discrimination because of an actual disability under the *McDonnell Douglas* burden shifting framework. In her Response, however, Murray states that she "is relying upon direct evidence of an intent to discriminate on the basis of [her] disability…." (Pl's Resp. in Opp. at 23–24) (emphasis in original). At oral argument, counsel reiterated that Murray's case is a direct evidence case. (Hr'g Tr. 45:7-9.) It appears (at least as it pertains to the non-alcohol related disability) that Murray would like the Court to find that she has presented direct evidence that PMA discriminated against her because of the cotton mouth she may have had on the day of the incident, purportedly caused by the Lomotil that she took for the fistula. She has not done so.

In *Eastman v. Research Pharmaceuticals, Inc.*, Linda Eastman suffered from serious back pain, which she alleged was a disability within the meaning of the ADA. 2013 WL 3949236, at *9. While on a work assignment visiting a clinical trial, a doctor also on the visit examined her and gave her Valium without a prescription. *Id.* at *2. Shortly after taking the drug, Eastman participated in a conference call with a company client, during which she laughed, slurred her words, and stated on the call that she had taken Valium and was "knocked off her feet." *Id.* at *3–*4. She was subsequently fired for unprofessional behavior and violating her employer's drug policy. *Id.* at *3. Eastman claimed to have proffered direct evidence that she was fired as a result of her back condition. *Id.* at *10. Specifically, she contended that because she

took the Valium to treat her disability and was fired for taking the pill, this was direct evidence of discrimination. *Id.* at *11.

The court rejected her theory, noting that Eastman did not present any legal authority to support the proposition "that being terminated for taking a legal drug to treat a disability is direct evidence of discrimination *because* of that disability." Eastman's argument "relie[d] on the *inference* that firing someone for Valium use means the employer is actually firing the employee because of their disability." *Id.* Finally, the court stated that none of the company employees' statements showed "a discriminatory or retaliatory animus" to Eastman's purported back disability and that she had therefore not met the "high level required of direct evidence." *Id.*

Here, there is no evidence that Murray's termination was *because* of her disability, despite her allegation that a symptom from her medication might have contributed to the decision to fire her. As in *Eastman*, Murray's argument relies on the *inference* that firing her for symptoms from Lomotil use means that PMA fired her because of her anal/vaginal fistula. Direct evidence cases do not require any inferences to be made.

ii

Since Murray has not provided direct evidence of disability discrimination due to her fistula and despite her failure to respond to PMA's analysis of the evidence under the *McDonnell Douglas* framework, the Court will also assess the record to determine if Murray can survive summary judgment under that standard. Murray must first establish a *prima facie* case of discrimination. Again, she claims that PMA fired her because of the symptoms she experienced from medication she was taking for her

anal/vaginal fistula. At the outset, to establish a claim for discrimination because of a disability, the employer must know of the disability. *Curran v. Se. Pennsylvania Transp. Auth.*, No. 13-5919, 2015 WL 1542290, at *6 (E.D. Pa. Apr. 7, 2015); *see also Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996). Further, mere knowledge of an employee's disability is not enough. *Gutknecht v. SmithKline Beecham Clinical Labs., Inc.*, 950 F. Supp. 667, 671 (E.D. Pa. 1996), *aff'd*, 135 F.3d 764 (3d Cir. 1997). The decision maker must have acted with discriminatory animus. *Id.* Here, McGill made the decision to terminate Murray and, as Murray's counsel acknowledged, there is no record evidence that McGill knew that Murray ever took medical leave, the specific nature of the disability or that she took medication for that disability that had the effect of leaving her with a dry mouth. (Hr'g Tr. 38:9-10).

In her response to the motion for summary judgment, Murray does not even mention the "cat's paw" theory of liability. For the first time at oral argument, however, counsel turned to *Staub v. Proctor Hospital*, 562 U.S. 411 (2011) and the "cat's paw" in an effort to prove that McGill's decision was influenced by others who were motivated to see Murray fired. The cat's paw allows an employee to hold the employer liable if the employee is "subjected to an adverse employment action by a decisionmaker who is himself free of discriminatory animus, but whose actions are influenced by other employees who are motivated by discriminatory animus." *Burlington v. News Corp.*, 55 F. Supp. 3d 723, 731 (E.D. Pa. 2014). The employee with the discriminatory animus must have "influenced or participated in the decision to terminate." *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001). As the Supreme Court explained in *Staub*, the employee must have been "motivated by hostility" and

his or her actions must have been "*designed and intended* to produce the adverse action." *Staub*, 562 U.S. at 420 (emphasis in original). In that case, there was evidence that Staub's supervisors were openly hostile toward his military obligations. The supervisors talked about how those obligations were a strain on the department, they asked other colleagues to "help get rid of" Staub and falsely stated Staub had violated a hospital policy. *Id.* at 414. Based on this and other inaccurate information, the hospital vice president later fired Staub. The Court held that the employer was liable because the vice president, the decision maker, relied on biased reports from supervisors who were motivated by hostility and whose actions were designed and intended to have Staub fired. *Id.* at 420.

Murray is suspicious about the roles Hastie and Brookey may have played in her termination. She does not, however, contend that either of them participated in McGill's decision to fire her or even recommended to McGill that he do so. Murray's theory is far more attenuated—she claims (again, for the first time at oral argument) that this is a case about "filtering of evidence [by Hastie and Brookey] to achieve a result." (Hr'g Tr. 43:8-12.) Counsel explained that "the only information that was relied on in making the decision to terminate was the input from Hastie and Brookey" and thus, the investigation could have been affected by their alleged discrimination. (Hr'g Tr. 54:7-13.) First of all, that misstates the record. Hastie and Brookey were two of five people who provided, at McGill's request, statements about their interactions with Murray and their impressions of her conditions. All five witness statements were given to McGill. (Hastie Dep. 99:3-15; 97:8-9; Carney Dep. 77:3-78:6.) Second, the record shows that Hastie did not know Murray took any medical leaves or that Hastie

had any knowledge of Murray's anal/vaginal fistula or use of Lomotil. (Hastie Dep. 8:25-9:2; 14:18-22; 15:6-11; 17:24-25; 18:7-10; 35:4-6; 35:25-36:1; 51:24-52:6; 74:18-21; 76:7-9; 121:8-10; 154:18-155:1-6.) Murray is left to argue that Brookey had knowledge of Murray's anal/vaginal fistula and use of Lomotil and this knowledge somehow tainted the information that Brookey provided and influenced McGill's decision.

Nothing in Brookey's statement supports Murray's allegation. The statement makes no mention of any of Murray's alleged disabilities—either the fistula or any of the other physical ailments which Murray cited to earlier in the litigation before abandoning in her brief and at oral argument. (Brookey Statement.) Brookey's statement is comprised entirely of her observations of Murray's physical characteristics, the mannerisms which led Brookey (and everyone else who interacted with Murray) to conclude that Murray was inebriated and her shifting explanations as to why she smelled like alcohol—none of which pertained to a physical disability or medication, much less Lomotil. In fact, the only reference to medication in Brookey's statement is to note that Murray said that she occasionally takes Xanax and Valium, but had not taken either that day. (Brookey Statement.)

Brookey's observations were neither biased nor fabricated like the reports created by Staub's supervisors. Moreover, they are consistent with the assessments of every other witness who provided a statement, *see supra* Section I, and there is no evidence showing that Brookey influenced what those witnesses had to say or the decision McGill made. Further, neither the content of her statement nor any other record evidence suggests that Brookey was hostile towards Murray, possessed any discriminatory animus toward her or that she wanted to see Murray fired. In fact,

Brookey testified that it came as a surprise to her when she learned of Murray's termination.  (Brookey Dep. 32:22-33:4.)  Brookey testified that she knew Murray had taken time off for a medical condition in 2009 but was not aware of any diagnoses or any of Murray's concerns regarding her medical conditions.  (Brookey Dep. 12:10-19; 34:25-35:2.)  Murray testified that "[Brookey] knew about my conditions" but then only discussed Brookey's knowledge about Murray's psoriasis because Brookey is the one who noticed it.  (Murray Dep. 31:1-6.)  There is no record evidence that Brookey ever knew about Murray's anal/vaginal fistula.  Moreover, there is no evidence in the record that Brookey knew Murray took Lomotil on the day of the incident.  In fact, Hastie and Brookey both testified that Murray told them at the meeting that she did not take any medications that day.  (Hastie Dep. 22:3-7; Brookey Dep. 24:3-25.)

For her part, Murray testified at one point that she "hadn't taken anything" that day but later in her deposition said that she took Lomotil that day, although she did not know if she took it in the office or prior to arriving at work.  (Murray Dep. 138:12-139:22; 153:3-9.)  In any event, when asked if the Lomotil caused her to have cotton mouth that day, Murray said: "I don't remember, to be honest with you, but I don't think so."  (Murray Dep. 153:22-154:3.)  Murray nonetheless also testified that she had told Brookey about having cotton mouth during the meeting.  (Murray Dep. 40:10-12.)  Even viewing Murray's overall testimony in the light most favorable to her, it does not help her case.  No reasonable jury could conclude, based on a general symptom like dry mouth, that Brookey knew it was attributable to a medication that Brookey didn't know Murray was taking for a specific ailment that Brookey did not know she had.  *See Long v. Thomson Industries, Inc.*, No. 99-1693, 2000 WL 1586078, at *7 (E.D. Pa. Oct. 24,

2000) (holding that plaintiff failed to state a *prima facie* case of discrimination under the ADA because the employer did not know that the employee's symptoms were caused by a disability).[5]

Even if Murray were able to state a *prima facie* case of discrimination, PMA had a legitimate nondiscriminatory reason for firing her for violating the company's substance abuse policy.[6] (Hastie Dep. 21:12-17; Carney Dep. 73:9-12.) PMA did not fire Murray simply because her co-workers reported that she was slurring her words, the only condition Murray apparently suggests arises from the cotton mouth purportedly caused by her use of Lomotil. (Murray Dep. 36:5-37:5; 35:16-24.) McGill relied on several statements from witnesses who described in various ways Murray's behavior and appearance, many of which had nothing to do with whether or not Murray's mouth was dry: alcohol on her breath, eyes low and disoriented, changing subjects and repeating herself (Simmons Statement); delayed responses, flushed face, blank stare, rambling and changing subjects while answering questions (Brookey Statement); smell of alcohol, disheveled appearance, swaying, inability to comprehend (Mueller Statement); struggling to form thoughts, speaking in illogical sequences (Hastie Statement); inability to follow the topics being discussed (McGovern Statement).

---

[5]    Moreover, even if the record contained any evidence from which a jury could find that Brookey knew of Murray's specific condition and medication regimen, it is not sufficient to infer discrimination under the cat's paw theory. *See Garrow v. Wells Fargo Bank, N.A.*, No. CV 15-1468, 2016 WL 5870858, at *8 n.10 (E.D. Pa. Oct. 7, 2016) (noting that knowledge of a medical issue alone is not enough to demonstrate discrimination). Again, there is no evidence that Brookey wrote a biased report, was "motivated by hostility" or that her actions "were *designed and intended* to produce the adverse action." *Staub*, 562 U.S. at 420 (emphasis in original).

[6]    While there is a genuine issue of material fact as to whether Murray threatened Hastie in violation of the work place safety policy, violation of the substance abuse policy alone is sufficient for termination, *see* (Hastie Dep. 21:12-17; Carney Dep. 73:9-12).

The burden shifts back to Murray to show by a preponderance of the evidence that PMA's stated reason for her termination was a pretext for discriminating against her for having an anal/vaginal fistula. Although Murray failed to address this in her brief, counsel was given the chance to do so at oral argument. He stated that PMA's reason for firing Murray is unworthy of belief because

> [T]he people who were amassing the evidence knew that she had these conditions because she had told them. And they knew that she was taking these medications because she had told them. And they knew that these medications had this effect because: A) they're trained nurses; and B) because she had told them. And they didn't bother to tell [Carney] any of this. That's why the information that they had was unworthy of belief.

(Hr'g Tr. 48:16-49:5.) Again, this grossly distorts the record. There is no evidence that McGill, Carney, Hastie, Brookey, McGovern, Mueller, or Simmons knew that Murray had a fistula or that she used Lomotil generally. (Murray Dep. 33:22-24; Hastie Dep. 8:25-9:2; 14:18-22; 15:6-11; 17:24-25; 18:7-10; 35:4-6; 35:25-36:1; 51:24-52:6; 74:18-21; 76:7-9; 121:8-10; 154:18-155:1-6; Brookey Dep. 24:3-25.) Further, Murray did not tell McGill, Carney, Hastie, McGovern, Mueller, Simmons or Brookey on the day of the incident that she was taking any medication, let alone, Lomotil. (Hastie Dep. 22:3-7; Brookey Dep. 24:3-25; Murray Dep. 138:12-139:22.) If none of the employees involved knew about Murray's medication use, they could not possibly have known about the side effects.

## C

Murray's primary theory in her brief, but her second or "alternate" theory (apparently) is that PMA "regarded" her as an alcoholic and she was terminated because of this false perception. (Hr'g Tr. 26:20-25; Pl's Resp. in Opp. at 25.) An

individual has a disability under the ADA if they are "regarded as having" an impairment. 42 U.S.C. § 12102(2)(C). In a "regarded as" case, the focus is not on whether the plaintiff has the actual disability, but rather the perceptions of the people interacting or working with the plaintiff. *Kelly v. Drexel Univ.,* 94 F.3d 102, 108–09 (3d Cir. 1996).

Murray attempts to prove her *prima facie* case using direct evidence and relies solely on an isolated statement made by Hastie during her deposition. (Pl's Resp. in Opp. at 23–24; Hr'g Tr. 45:7-9; 53:18-25.) Counsel for the Defendants contends that the statement reflected a transcription error or mistake by the court reporter. (Hr'g Tr. 16:5-9; Reply, at 2 n.1.) Specifically, the following colloquy took place during Hastie's deposition:

> Q: Did you under – did you – did you not understand her statement was related to the way she was being treated as to her job at that point, being accused of alcoholism?
> A: I didn't know what she meant by it.
> Q: Well, what basis did you have to believe [Murray] was an alcoholic?
> A: I did not believe –
>     [Defense Counsel]: Objection as to form.
> A: I did believe she was an alcoholic.
> Q: Well, you believed she was impaired?
> A: I did.

(Hastie Dep. 26:17-27:3.)

This exchange does not evidence Hastie's belief that Murray was an alcoholic. Hastie's initial statement as to her "basis" to believe Murray was an alcoholic was "I *did not* believe," after which the discussion was interrupted by an objection. Second, counsel's follow-up as to whether Hastie believed Murray was "impaired" indicates that Hastie did not believe Murray was an alcoholic, or else counsel would not have tried to establish that Hastie believed she was at least impaired. Hastie's initial answer, that

she did not believe Murray was an alcoholic, is consistent with the entirety of Hastie's deposition testimony. *See* (Hastie Dep. 37:13-14 ("I did not – do not assume that she's an alcoholic"); 86:11-12 ("She never told us that she had an alcohol problem and she was not perceived to have one").) Hastie knows that alcoholism is a disability under the ADA (Hastie Dep. 85:17-86:12) and she testified several times that she did not know that Murray had any disability (Hastie Dep. 14:18-22; 15:6-11; 35:25-36:1; 76:7-9; 121:8-10.) Moreover, the statement Hastie provided to McGill made no mention of any drinking problem Hastie believed Murray may have had. Taking all of this evidence into account, no jury could reasonably conclude that Hastie perceived Murray to be an alcoholic.[7]

Even if Hastie's testimony was accurately transcribed and she did perceive Murray to be an alcoholic, Murray's claim still fails. McGill fired Murray—not Hastie— and there is no evidence to indicate that McGill thought Murray was an alcoholic. (Hastie Dep. 46:7-10.) At oral argument, counsel again attempted to rely on his newly introduced cat's paw theory to show that Hastie's "belief" influenced McGill's decision to fire Murray. Counsel argued that because Hastie "was significantly involved in the collection of the evidence," her belief that Murray was an alcoholic could have caused her to fail to collect all of the evidence (Hr'g Tr. 54:20-55:6). This argument lacks merit.

First, there is no evidence in the record that Hastie "failed to collect information" from additional witnesses. Hastie obtained statements from each witness, in addition to herself, who was involved throughout the chain of events: Simmons, Mueller,

---

[7]     The record evidence shows that the other employees believed that Murray was impaired or drunk on the day in question; not that they viewed her as an alcoholic. *See Mereletto v. Solar Power Indus., Inc.*, 2011 WL 3734244, at *6 (W.D. Pa. Aug. 24, 2011) (although plaintiff was fired for being drunk at work, the record contained no evidence that anyone regarded her as an alcoholic).

Brookey and McGovern.  Second, there is no evidence suggesting that when Hastie requested the statements she asked witnesses to comment on whether they believed that Murray was an alcoholic.  For example, when Hastie requested a witness statement from Mueller, she stated: "Could you please provide a written statement of what you observed/witnessed today in regards to Joan Murray?"  (Mueller Statement.) Third, there is no indicia of any bias in the statement that Hastie provided to McGill about the observations she made that day.  Unlike the falsified reports that the decisionmaker relied on in *Staub,* here, there is no record evidence indicating that anything in Hastie's statement was biased or false.  <u>Each observation</u> that Hastie included in the statement given to McGill is consistent with the assessments in every other witness statement.  *See supra* Section I.  Fourth, even looking beyond the statement that Hastie provided McGill, there is no evidence in the record that shows that Hastie was "motivated by hostility" or that her actions were "*designed and intended* to produce the adverse action," as required by *Staub*.  Hastie's "belief," if she had one, that Murray was an alcoholic does not equate to Hastie having discriminatory animus.  *See Garrow*, 2016 WL 5870858, at *8 (noting that an employer's belief that an employee had a disability is not sufficient to prove a *prima facie* case of discrimination without evidence showing discriminatory animus).  Further, Murray herself testified that the first time she ever met Hastie was during the meeting in Brookey's office. (Murray Dep. 124:2-6.)

IV

Murray also accuses PMA of retaliation under the ADA.  To state a *prima facie* case of retaliation, the plaintiff must show that she engaged in a protected activity, the

employer took an adverse action either after or contemporaneous with the employee's protected activity, and there was a causal connection between the employee's protected activity and the employer's adverse action. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). Murray's theory of PMA's alleged retaliation, like her discrimination claim, has changed a number of times throughout the litigation. Murray seemed to contend that PMA changed her job responsibilities in retaliation for her taking medical leave (Murray Dep. 111:4-121:21) but her lawyer abandoned that theory (Hr'g Tr. 21:3-15). Murray also argued in her Response to Defendants' Motion that the protected activity at issue was her "threat" that she would "come[] after" human resources "if this costs me my job," (Pl's Resp. in Opp. at 31), but that too was discarded at oral argument. (Hr'g Tr. 56:17-19.) The version she finally (apparently) landed on is that she was fired in retaliation for the "pattern of leaves" she took during her tenure at PMA. (Hr'g Tr. 56:20-57:4.) Even while asserting it, however, counsel acknowledged that this most recent iteration of his retaliation theory doesn't "get past temporal proximity" and that as a result he doesn't think he can prove the claim. (Hr'g Tr. 57:5-9.) He is right.

To establish the requisite causal connection between her protected activity of taking a medical leave and her termination, Murray must prove either: 1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory conduct, or 2) a pattern of antagonism coupled with timing. *Oden v. SEPTA*, 137 F. Supp. 3d 778, 791 (E.D. Pa. 2015), *aff'd*, 671 F. App'x 859 (3d Cir. 2016). There is no "unusually suggestive temporal proximity" between Murray's June 18, 2015 return from her leave of absence and her termination on December 14, a period of

almost six months.  *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) (a three month period between protected activity and adverse employment action did not suggest causation); *Escanio v. United Parcel Serv.*, 538 F. App'x 195, 200 (3d Cir. 2013) (a span of two weeks between the filing of a grievance form and plaintiff's termination was insufficient without evidence of unusually suggestive retaliatory motive); *Williams*, 380 F.3d at 760 (a span of two months between the plaintiffs request for an accommodation and his termination was not considered "unusually suggestive temporal proximity").

Murray is also unable to demonstrate a pattern of antagonism.  In fact, she doesn't even attempt to do so, which makes sense inasmuch as the record is replete with evidence to the contrary.  Murray took four leaves of absence between 2007 and 2012.  Each time she felt the process was handled appropriately.  (Murray Dep. 72:1-18; 78:16-21; 83:13-16; 86:13-15; 94:9-96:7; 101:12-17.)  She was subsequently promoted in November 2012.  (Promotion Letter, Mot., Ex. E.)  After taking her fifth leave of absence between December 2013 and January 2014, she was offered another promotion in October 2014, which she declined.  *See Escanio*, 538 F. App'x at 200 (finding no evidence of antagonism because plaintiff made several complaints and received promotions even after he made those complaints).  Further, Murray never alleges any discrimination prior to the December 2015 incident.

## V

In Count 3, Murray asserts a claim against PMA for violating the PHRA by treating her in a disparate and discriminatory manner and for retaliating against her because she engaged in protected activity.  (Compl. ¶ 61.)  A violation of the PHRA is

analyzed in the same manner as a violation under the ADA.  *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996); *Sowell v. Kelly Services, Inc.*, 139 F. Supp. 3d 684, 704 (E.D. Pa. 2015).  Since PMA did not violate the ADA, *see supra* Sections III–IV, Murray's PHRA claim fails.

Finally, in Count 4, Murray alleges that Brookey and Hastie aided and abetted PMA's discrimination in violation of the PHRA.  Again, since PMA did not engage in unlawful discrimination in violation of the PHRA, neither Brookey nor Hastie could have aided and abetted discrimination.  *Deans v. Kennedy House, Inc.,* 998 F. Supp. 2d 393, 414 n.20 (E.D. Pa. 2014), *aff'd*, 587 F. App'x 731 (3d Cir. 2014); *Kaniuka v. Good Shepherd Home*, No. 05-cv-02917, 2006 WL 2380387, at *10 (E.D. Pa. Aug. 15, 2006).

VI

It is not unheard of for a party to attempt to conform her theory of the case to the evidence as it develops throughout the discovery process.  This case went well beyond that.  Here, Murray's litigation strategy was akin to a game of whack-a-mole; each time the record evidence foreclosed one theory, Murray popped up with another one.  Indeed, her theories remained moving targets right through oral argument on the Defendants' Motion for Summary Judgment.  The fact that her positions and arguments continually changed demonstrates the dearth of evidence supporting any of her theories.  Judgment is entered for the Defendants accordingly.

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.